977 So.2d 811 (2008)
In re Judge Laleshia Walker ALFORD.
No. 2007-O-1893.
Supreme Court of Louisiana.
February 15, 2008.
*813 Office of Special Counsel, Steven Robert Scheckman, Special Counsel, Robert Edward McKnight, Jr., Assistant Special Counsel, for applicant.
Schiff Law Corporation, Leslie J. Schiff, Opelousas, Daryl Gold, Shreveport, for respondent.
Nancy E. Rix, Commission Counsel.
TRAYLOR, Justice.
This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana ("Commission"), pursuant to LA. CONST. ANN. art. V, § 25(C), that Laleshia Walker Alford, Judge of the Shreveport City Court, Parish of Caddo, State of Louisiana, be removed from judicial office and be ordered to pay the cost of these proceedings. After a thorough review of the facts and law in this matter, we find clear and convincing evidence sufficient to support the charges filed against Judge Alford and conclude that the Judiciary Commission's recommendation of discipline should be accepted.

FACTS and PROCEDURAL HISTORY
This judicial disciplinary proceeding was instituted by the Commission against Judge LaLeshia Walker Alford of the Shreveport City Court. Judge Alford assumed her judicial office on September 8, 1997, and she was reelected in 2002.
In May 2002, the Office of Special Counsel ("OSC") received an anonymous complaint which reported, among other things, that Judge Alford was repeatedly absent from work, that she canceled court dates without prior notice, and that she appeared on the bench impaired to such an extent that she was "inarticulate," "incoherent," or fell asleep. By letter dated July 30, 2002, Judge Alford's counsel responded to the complaint and denied any misconduct. In the response, Judge Alford maintained that her absences were reasonable and denied that she ever canceled court without giving notification. As to the allegations of impairment, Judge Alford stated that in 2000 she was diagnosed with fibromyalgia, a chronic pain and fatigue disorder which is commonly treated with prescription medications. Judge Alford admitted these medications "can cause sedation or somnolence on occasion," and she acknowledged "having held Court on occasions where her illness necessitated prescribed medication and she should have remained at home." Notwithstanding, Judge Alford represented that her health had "greatly improved."
After considering Judge Alford's response, the Commission authorized an investigation of the issues presented by the complaint. Following its investigation, the Commission applied for the interim disqualification of Judge Alford in November 2005, based upon a determination that she had abused, and was continuing to abuse, prescription pain medications. The Commission reached its conclusion based upon numerous sworn statements of persons *814 who worked with Judge Alford; the sworn statement of a pharmacist who had previously filled prescriptions for Judge Alford for narcotic pain medications; Judge Alford's records from doctors, hospitals, and pharmacies; and the report of two pharmacologists who were retained by the Commission to evaluate Judge Alford's medical and pharmaceutical history.
At the request of Judge Alford's counsel, this court delayed consideration of the Commission's recommendation of interim disqualification for several months while Judge Alford underwent a substance abuse evaluation at Pine Grove Hospital in Mississippi. Judge Alford's drug screen on admission to Pine Grove in December 2005 was positive for opiates, barbiturates, and benzodiazepines. Following the three-day evaluation, Judge Alford submitted a report from Pine Grove which found insufficient evidence of substance abuse or dependence.[1]
In the face of the conflicting medical testimony as to the effect of Judge Alford's use of prescription drugs, the court on February 1, 2006 remanded the matter to the Commission for an evidentiary hearing. In accordance with the court's order of remand, the Commission conducted a hearing on February 17, 2006. After Judge Alford testified, a recess was called and an agreement was reached that she would voluntarily seek substance abuse treatment; however, Judge Alford did not enter a treatment facility at that time, citing health problems and financial difficulties related to her desire to be treated at an out-of-state facility, for which her insurance coverage would be limited. Accordingly, the Commission reconvened the hearing on March 31, 2006. On April 13, 2006, the Commission filed its report in this court, reurging the members' belief that Judge Alford's problems with overuse of prescription drugs warranted her interim disqualification.
Within days of the filing of the Commission's recommendation, Judge Alford's counsel informed the court that Judge Alford had been examined by a psychiatrist on March 31, 2006 (the day of the Commission's second hearing), and that on April 3, 2006 she was admitted to the Willis-Knighton Behavioral Medicine Unit for evaluation and treatment, if indicated, of substance abuse or addiction. Judge Alford's drug screen on admission to Willis-Knighton was positive for benzodiazepines and propoxyphene, an opioid. Ultimately, however, no evidence was found that Judge Alford is addicted to or abuses any substance, and she was discharged from Willis-Knighton on April 7, 2006. This court nevertheless determined that Judge Alford should be disqualified from exercising any judicial function during the pendency of further proceedings, and on April 25, 2006, it was so ordered. In re: Alford, 05-2284 (La.4/25/06), 927 So.2d 270.

Formal Charges
The Commission filed three Formal Charges against Judge Alford on November 10, 2005, and a fourth on May 26, 2006. Charge No. 0256: Impairment through use of prescription drugs
This charge pertains to Judge Alford's use of prescription pain medications. Specifically, the Commission alleged that Judge Alford has "physical and psychological dependencies on prescription medications which seriously impair [her] judgment and mental faculties to such a degree *815 that [she has], on several different occasions, been significantly impaired while performing judicial duties, including on the bench and in chambers." The charge further alleges that Judge Alford has missed an inordinate amount of work as the result of her physical and psychological dependencies, and has frequently been late for work, creating additional work for her fellow judges and the court staff. Finally, the charge alleges that Judge Alford has failed or refused to obtain appropriate treatment for her physical and psychological dependencies, or the treatment she has obtained has ultimately been ineffective in helping her to overcome her dependencies.
On November 10, 2005, the Commission filed Formal Charge 0256 against Judge Alford, alleging that her conduct as set forth above violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary),`3 (a judge shall perform the duties of office impartially and diligently), 3 A(1) (a judge shall be faithful to the law and maintain professional competence in it), 3 A(2) (a judge shall maintain order and decorum in judicial proceedings), 3 A(3) (a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity), and 3 A(7) (a judge shall dispose of all judicial matters promptly, efficiently, and fairly) of the Code of Judicial Conduct. The Commission also alleged that Judge Alford engaged in willful misconduct relating to her official duty, willful and persistent failure to perform her duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const, art. V, § 25(C).[2] Finally, the Commission alleged that Judge Alford suffers from a disability that seriously interferes with the performance of her duties and that is or is likely to become permanent, justifying her involuntary retirement pursuant to La. Const, art. V, § 25(C). Charge No. 0257: Absenteeism
This charge pertains to Judge Alford's pattern of continued absenteeism and her failure to first notify her court staff that she would not be present, and her practice of habitually appearing late for court. It is alleged that Judge Alford's conduct in this regard negatively impacts the staff of the court, litigants, attorneys, and the other judges of the Shreveport City Court, and places the court in disrepute in the eyes of the public.
On November 10, 2005, the Commission filed Formal Charge 0257 against Judge Alford, alleging that her conduct as set forth above violated Canons 1, 2 A, 3, 3 A(7), and 3 B(1) (a judge shall diligently *816 discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business) of the Code of Judicial Conduct. The Commission also alleged that Judge Alford engaged in willful misconduct relating to her official duty, willful and persistent failure to perform her duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const, art. V, § 25(C).
Charge No. 0258: Detention of a juvenile
This charge pertains to Judge Alford's detention of a juvenile, G.S., in a holding cell at the court facility.
On November 10, 2005, the Commission filed Formal Charge 0258 against Judge Alford, alleging that she knowingly abused her judicial authority and failed to uphold the law in order to "make an impression" on a "wayward teenager." The charge further alleged that Judge Alford failed to be patient, dignified, and courteous when she yelled at G.S. in court, all in violation of Canons 1, 2 A, 3, 3 A(1), 3 A(2), and 3 A(3) of the Code of Judicial Conduct. The Commission also alleged that Judge Alford engaged in willful misconduct relating to her official duty, in violation of La. Const, art. V, § 25(C).
Charge No. 0259: Personal use of court staff
This charge pertains to Judge Alford's use of court staff to handle personal matters. Shirley Ann Brown worked for Judge Alford as an administrative assistant from early 2002 until August 2004, when her services were terminated by Judge Alford. In September 2004, Ms. Brown filed a complaint with the OSC alleging, among other things, that Judge Alford misused court staff and required public employees to perform personal duties for her and her mother and son. Judge Alford responded to Ms. Brown's complaint and denied any misconduct.
On November 10, 2005, the Commission filed Formal Charge 0259 against Judge Alford. The charge alleges that Judge Alford routinely required her administrative assistants and deputies from the Marshal's Office to perform non-court related duties for herself, her mother, and her son, during court hours, after court hours, and on weekends. These individuals were paid by the Shreveport City Court and by the Marshal's Office, and received no other compensation from Judge Alford, the court, or the Marshal's Office to perform these additional duties, which is alleged to constitute a misuse of public funds. The charge further alleges that Judge Alford allowed and/or required her administrative assistant to work on her reelection campaign during work hours (when she was being paid exclusively by the Shreveport City Court), and that Judge Alford used the court's supplies, such as telephone and fax lines, to further her campaign. Finally, it is alleged that Judge Alford was abusive to her administrative assistants, in that she was demeaning and unreasonably demanding, and as such, created a hostile working environment. The Commission alleges that such conduct violated Canons 1, 2 A, 2, B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), 3 B(1), and 3 B(2) (a judge shall require staff, court officials, and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties) of the Code of Judicial Conduct. The Commission also alleged that Judge Alford engaged in willful misconduct relating to her *817 official duty, willful and persistent failure to perform her duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const, art. V, § 25(C).
Charge No. 0272: Impermissible ex parte communication
This charge pertains to Judge Alford's failure to refrain from engaging in impermissible ex parte communications and failure to act as a neutral arbiter in a pending case.
In October 2004, an anonymous complaint was received by the OSC which alleged that Judge Alford had engaged in impermissible ex parte communications with Michael Jones, a Washington, D.C. attorney whom Judge Alford had known since childhood. Mr. Jones was seeking a peace bond with regard to his nephew, Raymond Darnell, who resided with Mr. Jones' mother, Mrs. Hazel Jones.[3] The complaint described alleged irregularities in Judge Alford's handling of this matter, Jones v. Darnell, PB04-181.
On May 26, 2006, the Commission filed Formal Charge 0272 against Judge Alford. The charge consists of two counts. In Count I, the Commission alleges that Judge Alford met with Mr. Jones on July 27, 2004 regarding a peace bond against his nephew, and that she advised Mr. Jones as to the procedures for filing a peace bond complaint. Count I further alleges that Judge Alford contacted Veronica Glover, a deputy clerk of the Shreveport City Court, to instruct her to accept the complaint, to set a special session for the hearing, and to assign the case to her, in violation of the rules of random allotment. In Count II, the Commission alleges that on July 29, 2004, Judge Alford held a special session peace bond hearing in the matter of Jones v. Darnell, during which she failed to ensure that any of the participants were sworn to testify. Furthermore, it is alleged that none of the documents presented by the plaintiff were marked as exhibits, admitted into evidence, or retained in the record, and that Judge Alford considered hearsay evidence without securing an agreement or stipulation from the parties that the authors of the documents, if called to testify, would do so consistently with their written statements. Finally, Count II alleges that Judge Alford. disregarded the wishes of the parties in the case and improperly asserted her judicial authority.[4]
As to each count of Formal Charge 0272, the Commission alleges that Judge Alford's conduct violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4) (a judge shall perform judicial duties without bias or prejudice), 3 A(6) (a judge shall not permit private or ex parte interviews, arguments, or communications designed to influence his or her judicial action in any case), 3 *818 B(1), and 3 C (a judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which recitation is required by law or applicable Supreme Court rule) of the Code of Judicial Conduct. Further, as to each count, the Commission alleges that Judge Alford engaged in willful misconduct relating to her official duty, willful and persistent failure to perform her duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const, art. V, § 25(C).

Findings of the Commission
Charge No. 0256: Impairment through use of prescription drugs
The Commission did not view its task as having to diagnose whether Judge Alford was addicted to prescription drugs or whether she abused prescription drugs on isolated occasions. The members noted that Formal Charge 0256 alleged that Judge Alford had physical and psychological dependencies that impaired her judgment and affected her judicial duties, including when she was on the bench, and further that such dependencies caused her to miss an inordinate amount of work and/or caused her to be late for work, all being detrimental to the functioning of her court. Notably, Judge Alford did not dispute the types, amounts, and frequency with which she took the drugs listed on her exhibits; however, she disputed that those drugs were so excessive that she was impaired. The Commission found the evidence overwhelming, clear and convincing that Judge Alford's excessive use of prescription drugs over a lengthy period, apparently due to pain caused by physical ailments, impaired her judgment on the bench on occasions and the effects of the drugs she took impaired her relationships with court colleagues and staff. Further, it was proven that the drugs, together with her illnesses, caused her to be absent from work excessively. The Commission members reached their conclusion about excessive absences that negatively affected the entire court based upon witness testimony and not upon the charts or informal statistics maintained by some of the witnesses.
Based on the evidence, the Commission found that over a period of years Judge Alford was prescribed and apparently purchased a very large quantity of narcotic drugs, and that such large quantities over a long period of time had to have affected Judge Alford's cognition and physical health. The Commission further noted the discrepancies in the proven facts and what Judge Alford told the treatment providers she consulted, and concluded that Judge Alford's assessment of her condition was not reliable.
The Commission found that the symptoms of cognitive impairment by a person who combined narcotic and other potent drugs were consistent with witness testimony and documentary evidence in the record as to Judge Alford. Taking into account the narcotic and other potentially addictive drugs Judge Alford used over a lengthy period, and the testimony the Commission found credible as to her conduct and absences from court, the Commissioners concluded that the public was at risk so long as there was no mechanism in place to assure that Judge Alford was not impaired by drug use. The Commissioners did not understand why, under the circumstances presented, Judge Alford, if she were not addicted or dependent, did not completely abandon the use of narcotic drugs.
The Commission believed that Judge Alford could be weaned from the addictive drugs she has taken, but that doing so would take a long period of time, and her *819 ability to function up to the necessary level in the meantime was unlikely.
The Commission felt that Judge Alford's case is not comparable to one where a judge suffers from a chronic disease or physical ailment that does not impair cognitive abilities or produce debilitation over an indefinite period of time. In such a hypothetical case, among other things, the Commission would try to work with the judge to determine if disability retirement or a leave of absence were viable options. The evidence presented demonstrated that Judge Alford has experienced a cycle of problematic prescription drug use, with her behavior fluctuating.
Charge No. 0257: Absenteeism
The Commission concluded that Judge Alford's absences from and/or lateness to court were part and parcel of the problems she had as the result of taking very large quantities of prescribed drugs. The Commission found that Judge Alford was absent from court to the extent that it negatively impacted the functioning of the court.
Charge No. 0258: Detention of a juvenile
The Commission recognized Judge Alford's laudable intention to make a positive difference in the life of a teenager who was having difficulties, but found that locking up a juvenile in an adult facility, in particular in a court that had no facilities for juvenile detention, was legally wrong.[5] The Commission further found that in addition to the illegality of ordering G.S. detained in a holding cell, Judge Alford's speech to him was excessive and demonstrated her failure to be patient, dignified, and courteous (". . . you will be in juvenile detention so fast, and by the time your lawyer get [sic] to you, you would have been raped by somebody else."). As to her chastising of G.S., the Commission compared Judge Alford's conduct to that of Judge James Best, for which he was publicly censured (Judge Best said, ". . . take him and stick him upside down in a trash can and haul him out to the yard."). See In re: Best, 98-0122 (La.10/20/98), 719 So.2d 432. The Commission found that Judge Alford's conduct as to G.S. violated the Code of Judicial Conduct, including (1) Canon 2 A, which requires a judge to respect and comply with law, and she violated Article 822(C) of the Children's Code; (2) Canon 3 A(1), which mandates that a judge be faithful to the law and maintain professional competence in it; and (3) Canon 3 A(3), which states that a judge shall be "patient, dignified, and courteous to litigants, . . . and others with whom the judge deals in an official capacity." In the Commission's opinion, the overreaching conduct of Judge Alford was also willful misconduct relating to her official duty, and thus a violation of La. Const, art. V, § 25(C). Because she violated a clearly worded statute as to the illegality of holding a juvenile in an "adult jail or lockup," the Commission found it disturbing that Judge Alford testified that even if she lost her robe as the result of her treatment of G.S., it would have been worth it. The Commissioners concluded that had this been the only proven charge as to Judge Alford's ethical misconduct, they would have recommended public censure to the Court.
Charge No. 0259: Personal use of court staff
The Commission found by clear and convincing evidence that Judge Alford improperly used staff who were paid with public funds to perform many personal errands for her, her mother, and her son. The many examples of personal services *820 performed for Judge Alford and for Mrs. Walker, her mother, reflected clearly and convincingly that Judge Alford violated Canons 1, 2 A, 3 B(1) and 3 B(2) of the Code of Judicial Conduct. Had the use of public employees for private purposes been the sole ethics violation, the Commission would have voted to recommend publicly censuring Judge Alford.
Charge No. 0272: Impermissible ex parte communications
As to Charge 0272, which concerned Judge Alford's handling of a peace bond proceeding at the request of Mr. Michael Jones, all with regard to his nephew, Mr. Darnell, the Commission concluded that Judge Alford violated Canon 3 C of the Code of Judicial Conduct. The Commission opined that Canon 3 C required her recusal from the case because of her prior relationship with Mr. Jones and his family, and that Judge Alford's bias in favor of Mr. Jones was evident from her comments from the bench and in her ruling.
Secondly, the Commission found that Judge Alford had engaged in discourse with Mr. Jones about the merits of the case on an ex parte basis, which violated Canon 3 A(6).
Finally, the Commission found that Judge Alford's treatment of Mr. Darnell and Mrs. Hazel Jones demonstrated that she was not patient, dignified, or courteous, as required by Canon 3 A(3) of the Code of Judicial Conduct. The Commission further stated that Judge Alford's distortion of the legal process in the matter was an abuse of her power, which violated La. Const, art. V, § 25(C). For her handling of Jones v. Darnell, the Commission would recommend to the Court that Judge Alford be suspended without pay for 30 days, were Charge 0272 the only proven charge.
In summary, the Commission concluded that Judge Alford violated several canons of the Code of Judicial Conduct as well as the Louisiana Constitution, as follows:
Judge Alford violated Canon 1, which states in pertinent part: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. . . ." by the conduct proven as alleged in Charges 0256 and 0257, because a judge who performs judicial duties while impaired by prescription drugs or is absent because of such impairment fails to observe high standards of conduct to promote public confidence in the integrity of the judiciary. Judge Alford violated Canon 1 as to Charge 0258, because exercising jurisdiction over a juvenile without authority and detaining him in a holding cell are inconsistent with observing high standards of conduct so that the integrity of the judiciary is preserved. Judge Alford violated this canon as to Charge 0259 because using court employees paid with public funds for personal tasks is a failure to maintain standards of conduct that preserve the integrity of the judiciary. Judge Alford violated this canon as to Charge 0272 by taking a case as a favor for a friend, and failing to observe basic procedural law.
Judge Alford violated Canon 2 A, which provides in pertinent part: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. . . .," by the conduct proven as alleged in Charges 0256 and 0257, because a judge who performs judicial duties while impaired by the use of prescription drugs and a judge who fails to attend to her court docket by being absent or arriving late repeatedly fail to promote public confidence in the integrity of *821 the judiciary. Judge Alford violated Canon 2 A as to Charge 0258 because she ordered a juvenile to be detained in a court holding cell in violation of the Children's Code. Judge Alford violated this canon as to Charge 0259 because using court employees paid with public funds for personal tasks fails to promote public confidence in the judiciary, and as to Judge Alford allowing, permitting or directing staff to perform services for her mother, Mrs. Walker, Judge Alford also violated Canon' 2 B because she allowed the prestige of her office to be used for the benefit of another. Judge Alford violated Canon 2 A by taking a peace bond case and failing to apply court policy and failing to observe the requirements of law as she handled it. Judge Alford also violated Canon 2 B by using the prestige of her judicial office for the benefit of another  taking Mr. Jones' complaint in order to do a favor for him.
Judge Alford violated Canon 3 A(1), which states in relevant part: "A judge shall be faithful to the law and maintain professional competence in it. . . .," by the conduct proven as alleged in Charge 0258, because detaining a juvenile in a manner contrary to the Children's Code is a failure to be faithful to the law and to maintain professional competence in it. By her taking the case of Jones v. Darnell and failing to apply the rules and policies of her court and law in connection therewith, as alleged in Charge 0272, Judge Alford violated this canon's directive that a judge be faithful to the law.
Judge Alford violated Canon 3 A(2), which requires a judge to "maintain order and decorum in judicial proceedings," by the conduct proven as alleged in Charge 0256, because to preside while impaired by ingesting large quantities of prescription drugs over a long period of time results in the failure of judicial decorum. Judge Alford violated this canon as to Charge 0258 due to the manner in which she dealt with the juvenile son of a litigant.
Judge Alford violated Canon 3 A(3), which provides: "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, . . .," by the conduct proven as alleged in Charge 0256, because presiding while impaired by drug use is undignified. As to Charge 0272, Judge Alford violated this canon as to Mr. Darnell, to whom she was rude and undignified, nor was she patient with Mrs. Hazel Jones. The Commission further found that Judge Alford handled the Jones v. Darnell case and exhibited bias in favor of the applicant for the peace bond, which also violated Canon 3 A(4)'s requirement that a judge perform judicial duties without bias.
Judge Alford violated Canon 3 A(6), which states in pertinent part, "Except as permitted by law, a judge shall not permit private or ex parte interviews, arguments or communications," by the conduct proven as alleged in Charge 0272, as to her meeting with Mr. Michael Jones, which precipitated his seeking a peace bond against his nephew in a setting that Judge Alford had assigned to herself, even though it was not her month to handle that docket.
Judge Alford violated Canon 3 A(7), which states, "A judge shall dispose of all judicial matters promptly, efficiently and fairly," by the conduct proven as alleged in Charges 0256 and 257, because given her condition while on the bench, and in light of her absenteeism and tardiness, the administration of her court was deficient.
Judge Alford violated Canon 3 B(1), which states in relevant part, "A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration," by the conduct proven as alleged in Charge 0257 *822 because repeated absences and tardiness constitute a failure of judicial administration. Judge Alford violated this canon when she used her staff improperly for personal reasons for herself and for her mother, because doing so failed to maintain professional competence in judicial administration.
Judge Alford violated Canon 3 B(2), which states in relevant part, "A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge," when she engaged her staff in work toward her judicial campaign for reelection in violation of her court's policy that employees not engage in political activity. Further, the fund raising actions undertaken by Ms. Brown, the secretary, were ethically impermissible as to Judge Alford.
Judge Alford violated Canon 3 C, which provides in pertinent part, "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," as indicated by the totality of the manner in which she handled the peace bond sought by Mr. Michael Jones, as set forth in Charge 0272. Her long time relationship with Mr. Jones and the advantages she provided to him as she presided in his case, showed that she was not impartial. Recusation was necessary, and Judge Alford not only did not disqualify herself, she took extreme measures to preside in the first place.
Judge Alford violated Canon 7 B(1)(b), which provides, "[A] judge . . . shall prohibit employees and officials who serve at the pleasure of the candidate, and should discourage other employees and officials subject to the candidate's direction and control, from doing on the candidate's behalf what the candidate is prohibited from doing under this Canon," by permitting her secretary, Shirley Brown, to be actively involved in political fundraising. Judge Alford could not fund raise on her own, thus she permitted her personal employee to do for her what she could not do. This violated Canon 7 B(1)(b).[6]
Judge Alford violated La. Const. art. V, § 25(C), by engaging in willful misconduct relating to her official duty, by her willful and persistent failure to perform her judicial duty in an appropriate manner, and by her persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, which was proven as to all of the Formal Charges. In particular, Judge Alford failed to be a neutral arbiter when she undertook the case of Jones v. Darnell, regarding a peace bond.
While the Commission did not charge Judge Alford with committing a crime and did not focus upon whether a crime was committed, the Commission believed the underlying facts, as set forth in the Formal Charge, were intentional. The Commissioners believed that Judge Alford did not intend to become physically and/or psychologically dependent upon prescription drugs. Finally, and most significantly, the Commission concluded that Judge Alford sincerely wanted to be a good judge.

Recommendation of Discipline
In recommending discipline, the Commission looked to the factors set forth by this court in In re: Chaisson, 549 So.2d 259 (La.1989). As a consequence of all the facts found and conclusions drawn, the Commission concluded that serious discipline is necessary to protect the public from being exposed to a judge with a history of being incapable of making sober *823 decisions due to the effects of prescription drugs. The Commission's report states:
Having earlier found probable cause of serious judicial misconduct that presented a danger to the public, which led to interim disqualification, the Commission now believes there is clear and convincing evidence that Judge Alford should be removed from office. As to the various other conclusions as to misconduct, the Commission did not cumulate the effect of two additional censures and the 30-day suspension recommendation. Because of their sorrow that such an able person as Judge Alford, who had many hurdles to overcome in her life before she was elected judge, erred at least in part because she took medications that were prescribed for her physical ailments, the Commission took the unusual step of notifying Judge Alford that a serious recommendation of discipline would be made in late September or early October. In this notice the Commission suggested to her that she take immediate affirmative steps toward more treatment regarding her drug use, commit to a monitoring program through Lawyers Assistance or otherwise, provide a track record of attendance at Narcotics Anonymous, and certain other criteria. See Exh. C. The Commissioners decided that if Judge Alford were to take meaningful corrective measures in the interim time before the Commission lodged the record in these proceedings, the Commission would instruct the Special Counsel to advise the justices at oral argument that the Commission members recommend something less than removal. This lesser recommendation could be a suspension without pay to the end of her term (December 20,08), so long as she complies with probationary terms identical or substantially similar to those imposed in the case of Judge Allen Krake. Absent Judge Alford taking control of her problems and addressing them in a manner that will provide confidence she can proceed, if reelected, as an unimpaired jurist, the Commission maintains its recommendation of removal. The Commission also reminds the Court that the justices may, pursuant to La. Sup.Ct. Rule XIX, § 6b, wish to refer to the Lawyer Disciplinary Board the issue of Judge Alford's health to determine if there is a basis to restrict her license to practice law. [Emphasis added.]
Accordingly, subject to Judge Alford's filing with the court "compelling evidence" of her further drug treatment and acceptable terms of probation, as discussed in the foregoing paragraph, the Commission recommended that Judge LaLeshia Walker Alford be removed from judicial office and that she be ordered to reimburse and pay to the Commission the amount of $27,199.02 in hard costs.

DISCUSSION
This Court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. Art. V, § 25(C), and therefore has the power to make determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In re King, XXXX-XXXX (La.10/21/03), 857 So.2d 432, 445. The charges against a judge must be proved by clear and convincing evidence before this Court can impose discipline. In re Hughes, XXXX-XXXX (La.4/22/04), 874 So.2d 746, 760.
Charge 0257: Impairment through use of prescription drugs.
Numerous lay witnesses, including employees of both the Shreveport City *824 Court and the Marshal's Office, were called by Special Counsel to testify concerning Judge Alford's use of prescription drugs and the effects of such on her ability to preside in court. The testimony of these witnesses was generally very consistent. Nearly all of the witnesses noted that Judge Alford took prescription medications throughout the day and while she was on the bench, particularly the nasal spray Stadol. The witnesses also thought that the judge was medicated on these occasions because she seemed confused, disoriented, and drowsy, even to the point that she appeared to be asleep. On occasion, Judge Alford required assistance to stand or to walk from one place to another while she was at court. Finally, nearly all of the witnesses commented that Judge Alford's speech became "slurred" after she took medication.
Dr. Lonald Daughtry of Xavier University, an expert in psychopharmacology, testified before the Commission in connection with the hearing on interim disqualification, and again at the hearing on the merits. Dr. Daughtry reviewed Judge Alford's medical and pharmaceutical records and determined that she was regularly consuming what is known in the vernacular as the "Trinity Cocktail," a highly addictive combination of the prescription drugs Xanax (Valium or clonazepam can be substituted for Xanax), Soma (Zanaflex or Flexeril can be substituted for Soma), and Vicodin (Lortab is another name for the drug Vicodin). In addition to the drugs that comprise the Trinity Cocktail, Dr. Daughtry observed that Judge Alford was regularly using Duragesic, a Schedule II narcotic usually administered in patch form, and Stadol, a Schedule IV narcotic usually administered in nasal form, both of which are highly addictive. When asked about the effects of taking the Trinity Cocktail together with Stadol and the Duragesic patch,[7] Dr. Daughtry explained that the patient would experience "a major debilitation" of cognitive ability and motor function, as well as memory loss and syncope (blackouts or a brief loss of con' sciousness). Moreover, Dr. Daughtry testified that long-term polysubstance abuse can cause a host of physiological problems, including chronic constipation and gallbladder and pancreatic problems. Finally, Dr. Daughtry testified at length concerning respondent's history of doctor shopping,[8] utilization of multiple pharmacies to fill prescriptions, and her unusual in-depth knowledge of drugs and drug entities, all of which are characteristics of someone addicted to prescription drugs. Dr. Daughtry reiterated the view expressed in his written report that Judge Alford's case was the most severe he had seen in terms of the volume of prescription narcotics, doctor shopping, and use of multiple pharmacies.
When asked whether Judge Alford's medical and prescription drug records demonstrate that she poses a substantial threat of serious harm to the public or the administration of justice, Dr. Daughtry responded:
A. . . . I believe that . . . it would be virtually impossible for someone to consume this quantity of narcotic analgesics over a period of time and function in a *825 high cognitive level without being debilitated.
Q. And do you believe someone who sits as a judge and has consumed this amount of narcotics in these quantities, and particularly the ones that I'm emphasizing, the Trinity and the Duragesic patches and the Stadol, can function as a judge?
A. I wouldn't want to be in front of her, yeah. Yes, I don't believe that she could function adequately in that position.
Elaborating, Dr. Daughtry explained that he would expect that Judge Alford's cognitive abilities would be impaired as the result of her drug use, and that she would experience problems with judgment, insight, and memory. When asked how cognitive deficits could be manifested, Dr. Daughtry gave as examples laughing inappropriately during a serious situation, speaking in "word salads,"[9] or "talking at angles and not focusing on the issue." Dr. Daughtry opined that the transcripts from Judge Alford's jail clearance docket clearly show "some cognitive [dissonance]," as when she sentenced traffic offenders to attend family violence counseling and sentenced defendants charged with simple battery to attend driving school.[10]
Dr. Daughtry was also asked to review the reports of Judge Alford's evaluation at Pine Grove in December 2005 and at Willis-Knighton in April 2006. In both cases, he expressed concern that the information reviewed by the evaluators had been self-selected by Judge Alford, and that the evaluations did not include a review of both medical and prescription records. Moreover, Dr. Daughtry observed that the information self-reported by Judge Alford tended to minimize the severity of her use of prescription narcotics, if not deny such outright, reflecting that she was in denial as to her previous drug use.
We are fully cognizant that Dr. Daughtry had not examined Judge Alford, and that he based his opinions about her condition on the record of the prescription medications she purchased, her medical records, and upon the sworn statements of persons who had observed her behavior and conduct at her court; however, we agree with the Commission that Dr. Daughtry's extensive training and knowledge on the subject of prescription drug abuse make him an extremely credible witness. Further, as stated earlier, Judge Alford did not dispute the types, amounts, and frequency with which she took the drugs listed on her exhibits, instead disputing that her drug use was so excessive that she was impaired. We further agree with the Commission that the evidence was overwhelming that Judge Alford's excessive *826 use of prescription drugs over a lengthy period impaired her judgment on the bench on occasion. Judge Alford herself testified that since she was disqualified she and her doctor had worked to "wean her" off the large quantities of drugs she was taking. Were she not dependent on these drugs, the "weaning off procedure would have been unnecessary. Further, it was proven that the drugs, together with her illnesses, caused her to be absent from work excessively.
Dr. Daughtry testified that over a period of years Judge Alford was prescribed and apparently purchased a very large quantity of narcotic drugs, and Judge Alford admitted that looking at the list objectively one could conclude that she had ingested large amounts of drugs. Dr. Daughtry concluded that such large quantities over a long period of time would have had to have affected Judge Alford's cognition and physical health. Judge Alford denied she became addicted or abused drugs  she maintained she took what was prescribed for her and she trusted her doctors; however, the discrepancies between facts and what Judge Alford told her treatment providers render her assessment of her condition unreliable. Further, Judge Alford told the Commission in 2002 she had been ill, but she was doing much better  which is the message she repeated in 2007 toward the end of the hearing.
Most compelling are the audio tapes of proceedings conducted by Judge Alford that convincingly proved that she was impaired while performing judicial duties in 2005. Numerous witnesses gave credible testimony, with examples, of Judge Alford's inability to handle her docket competently. The symptoms Dr. Daughtry described as to cognitive impairment by a person who combined narcotic and other potent drugs were consistent with witness testimony and documentary evidence in the record as to Judge Alford. Taking into account the narcotic and other potentially addictive drugs Judge Alford used over a lengthy period and the testimony, the Commissioners did not err in concluding that the public is at risk so long as there is no mechanism in place to assure that Judge Alford is not impaired by drug use. The fact that drug use may be necessitated by a physical problem does not justify the adverse consequences to the public of a judge presiding while impaired. The Commission notes that even at this point in time, Judge Alford maintains that she may still need Lortab to get her through toothaches. Further, she made it clear she needs drugs for pain from fibromyalgia. Notably, Judge Alford testified to her improvement and her reduced use of the drugs, even though she has not achieved total abstinence. Nonetheless, as Judge Alford testified to what she perceived to be a hostile environment at her court, it is unclear how she will react to the stress of the workplace if she resumes her judicial duties. Under such circumstances, we are not convinced that she will be able to control her drug intake going forward.
Judge Alford testified to the difficulties of proceeding to counseling and other treatments for her problems with drug usage, and she adamantly maintained at her hearing that she still has serious physical ailments that produce chronic pain. As to counseling, Judge Alford cited the need for confidentiality, as did her evaluator at the Pine Grove facility in Hattiesburg, Mississippi.
For her part, Judge Alford adamantly denied that she has abused prescription drugs or is addicted to any medication. However, she acknowledged that "perhaps there was a point in [her] life that maybe [she] could have been taking too much medication," adding that she did so "unintentionally" *827 in an attempt to deal with chronic pain caused by her numerous medical conditions, among them fibromyalgia, migraine headaches, TMJ and other dental maladies, acute pancreatitis, and bile duct complications that necessitated multiple surgeries. Judge Alford denied that she was impaired as a result of taking the medication, but did allow that she "was very ill many times when [she] went to work."
When asked by her attorney what she has done to alter the use of medication in her life, Judge Alford replied that she has turned to alternative therapies such as acupuncture, massage therapy, and yoga, as well as deep-breathing exercises, stress management, praying, and meditating. Judge Alford also reported that she is using an electrical stimulation machine with great success. Finally, Judge Alford was reluctant to agree to seek further substance" abuse treatment, citing concern for her privacy if she were to do so.
Following the conclusion of her hearing the Commission sent a letter to Judge Alford suggesting that she (1) seek further treatment for the effects of her drug usage and (2) agree to and establish a record of objective monitoring to assure that she is free of the drugs that interfere with her ability to function adequately. The Commissioners had hoped that prior to the conclusion of the hearing Judge Alford would agree to enter a Narcotics Anonymous program through the Lawyers Assistance Program or otherwise. The members were impressed with the probationary terms proposed by Judge Allen Krake in 2006, which were accepted by the Court. See In re: Krake, 06-1658 (La.10/27/06), 942 So.2d 18. By the time the hearing ended, Judge Alford had made no such proposal, and still has not.
We find that the above evidence is clear and convincing that Judge Alford violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 3 (a judge shall perform the duties of office impartially and diligently), 3 A(1) (a judge shall be faithful to the law and maintain professional competence in it), 3 A(2) (a judge shall maintain order and decorum in judicial proceedings), 3 A(3) (a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity), and 3 A(7) (a judge shall dispose of all judicial matters promptly, efficiently, and fairly) of the Code of Judicial Conduct.
Charge 0257: Absenteeism.
The Commission concluded that Judge Alford's absences from court were directly related to her using very large quantities of prescription drugs, and that her absence negatively impacted the functioning of the court.
Several witnesses testified concerning Judge Alford's frequent absences from work (according to one witness, "at least maybe once or twice during the week") and her pattern of arriving late for court ("anywhere from 30 minutes [late] to two to three hours [late]"). Both the absences and the tardiness were noted by the witnesses to occur more regularly with respect to Judge Alford than any of the other judges on her court. Chief Judge Charles W. "Bill" Kelly, IV testified that the judges of the Shreveport City Court have always tried to fill in for each other when needed, particularly to avoid canceling a court docket unnecessarily. However, Judge Kelly testified that in 2004 or 2005 the court began requesting the appointment of an ad hoc judge to sit in for Judge Alford because of concerns over *828 "how much and how frequently we were filling in for her." Asked by one of the Commission members to rate how disruptive Judge Alford's behavior was on a scale from 1 to 10 (with 1 being the least disruptive and 10 being the most disruptive), Judge Kelly replied, ". . . I'd say a 10. She was highly disruptive, not only to the fair administration of the court but the morale and welfare among the court staff. I mean, it permeated everything."
In her answer to Formal Charge 0257 Judge Alford admitted that she had been absent from court on occasion "as a result of illness which is documented in the record," but she maintained that her absences were not "extraordinary or unusual" and that they were attributable to her medical condition. Judge Alford denied that her absenteeism has had any negative impact on court staff, the judges, litigants, or attorneys.
Judge Alford further testified that many of her problems at the Shreveport City Court were the result of a hostile work environment. She referred to other judges not understanding the health problems of a woman and/or the difficulties of a single working mother. Further, Judge Alford alluded to problems with "white deputies." We cannot know and do not address herein the validity or invalidity of Judge Alford's perceptions of gender and/or race bias or pressures that may have created a hostile work environment for her. We note, because Judge Alford has raised the issue, that some of the credible witnesses who testified against her were both African-American and female  for example, Ms. Gracie Harris, her secretary for several years; Ms. Shirley Brown, her secretary for 2^ years; and Ms. Veronica Glover, the court clerk who handled peace bonds, were all black females. Dr. Lonald Daughtry is also African-American. Judge Alford did not call as a witness Judge Randy Collins, the other African-American judge on her bench, and so we do not have the benefit of his views about a possible hostile work place as the result of racism. Nonetheless, we agree with the Commission that the photograph of Deputy Marshal David Emberton demonstrating his disrespect for Judge Alford offensive and indicative of hostility by Deputy Marshal Emberton and Deputy Marshal John Judice.[11] Testimony by Judge Alford and some of her witnesses suggested that Marshal Jimmy Dove may have participated in creating what Judge Alford perceived to be a hostile court environment, but Marshal Dove was not called as a witness by either Judge Alford or the Special Counsel. On the other hand, we cannot ignore the testimony *829 of numerous witnesses who were credible insofar as their statements about Judge Alford's mercurial personality and that she made their jobs unpleasant at times. In fact, over the course of the hearing, the Commissioners observed Judge Alford when she was angry and hostile, in particular toward the Special Counsel, and when she exhibited the pleasing personality referred to by various witnesses. Were we able to determine that a hostile workplace existed, over and above annoyances and personality conflicts that are routinely found in work relationships, such a determination could mitigate the discipline to be imposed for proven ethical misconduct. This would occur during the application of the Chaisson factors, but such mitigation cannot be determined on this record.
We find that the above evidence is clear and convincing that Judge Alford violated Canons 1, 2 A, 3, 3 A(1), 3 A(7) and 3 B(1) (a judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and shall maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business) of the Code of Judicial Conduct.
Charge 0258: Detention of a juvenile.
In 2002, Judge Alford was the presiding judge in a criminal case in which G.S.'s mother was charged with battery upon G.S.G.S. was fifteen years of age and was not charged with the commission of any offense, and furthermore, Judge Alford knew she lacked jurisdiction over G.S. because he was a juvenile. At a hearing in February 2002, Judge Alford was informed that G.S. had been "kicked out of school." In response, Judge Alford began to yell at G.S.:
Okay. Look, let me tell you something. As far as I'm concerned, your mama can beat you until you get on your own. That's how I feel about that. You're fifteen (15) years old. You are supposed to jump when she says jump. You are supposed to be in the house when she says be in the house, and the fact that you haven't been going to school, you must be out of your mind. I don't know what you think is going to happen to you. But what I will tell you is that you will go to Juvenile Court so fast, and you will be in juvenile detention so fast, and by the time your lawyer get [sic] to you, you would have been raped by somebody else. I've seen it happen too many times. You think you're going for bad, honey there are some people that are badder [sic], . . .
So, all of this disobedience, the Bible says disobedient children don't live long. That's why all these young people are dying because they don't listen to their mothers. They don't listen to their fathers. So, if you think that you can make it, get out, move out today. You can stay out all night, smoke weed all you want to, get you a crack piper [sic], lay on Sprague Street, do whatever you want, be a male prostitute, let your mama drive by and see you without any skin on your bones, if that's what you want to do. But if you are going to live in your mother's house, and she's going to pay the bills, then as far as I'm concerned, she can hit you every day.
* * *
That's how I feel about that, until you straighten up. I hope you get seventeen and get in front of me, and I have jurisdiction over you. I hope you turn your life around, and if you miss one more day of school I'm going to have a problem with that. I will call Juvenile Court, I will have you picked up. I will call the judges over there and I will have *830 you picked up as a truant if you miss one more day. . . . Do you understand me?
Judge Alford then told G.S. and his mother that she wanted them to return in three months to present a "progress report." When they returned to court on April 12, 2002, Judge Alford gave the mother symphony tickets for herself and G.S., and then inquired about his progress as follows:
DEP. MARSHAL: She brought a copy of his report card.
THE COURT: How does it look?
DEP. MARSHAL: Not good.
THE COURT: Why is [sic] his grades bad? "F". "D". What's going on? He's flunking reading. [G.S.], what is going on with you in your reading class?
JUVENILE G.S.: Nothing.
* * *
THE COURT: . . . Why aren't you studying?
[THE MOTHER]: He's hanging out.
THE COURT: Mr. Peck (Deputy Marshal).
MR. PECK: Yes, ma'am.
THE COURT: Show him . . . go lock him up in that cell back there for a minute.
Not realizing that G.S. was a juvenile, Deputy Marshal Peck complied with Judge Alford's instructions and placed G.S. in a holding cell at the Shreveport City Court. Upon learning that G.S. was only fifteen years of age, Deputy Marshal Peck attempted to contact Judge Alford concerning the matter; however, she was not available. Deputy Marshal Peck then informed his supervisor, Marshal Jimmy Dove, of the situation. Marshal Dove, in turn, contacted Judge Randy Collins, who ordered that G.S. be released from the holding cell.
In her testimony, Judge Alford acknowledged that she told Deputy Marshal Peck to "lock up" G.S., but she stated that she merely intended for Mr. Peck to show G.S. the holding cell. Judge Alford maintained that she wanted "to do . . . a scared-straight on this young man [G.S.] and show him that if he didn't correct his behavior, that this is what was in store for him." Judge Alford testified that she felt compelled to act in this manner "as a mother, as a citizen," and that if doing so "costs me my robe and I saved his life, the price is small."
While Judge Alford's intent with regard to a problem teenager may have been commendable, her execution of that intent by having her bailiff lock the child in a cell was both deplorable and illegal according to the Children's Code. Judge Alford could have escorted the juvenile to the detention section of her court and talked with him about the risks he faced if he broke the law or did not complete his education. There were a host of acceptable choices available to her to try to alter a negative turn in the life of the 15-year old. We agree with the Commission that Judge Alford's lecture to G.S. was excessive and demonstrated her failure to be patient, dignified, and courteous. We agree with the Commission that the overreaching conduct of Judge Alford was also willful misconduct relating to her official duty, and thus a violation of La. Const. art. V, § 25(C).
We find that the above evidence is clear and convincing that Judge Alford violated Canons 1, 2 A, 3, 3 A(1), 3 A(2) and 3 A(3) of the Code of Judicial Conduct.
Charge 0259: Personal use of court staff.
The Commission found that Judge Alford improperly used staff to perform many personal errands not only for herself, *831 her mother, and her son. Judge Alford maintained in her hearing testimony that she never required anyone to perform personal errands, and she only asked staff to pick up lunch for her when she was detained at court. Judge Alford's responses to this charge reflected that she did not appreciate the relative weaker position of employees who depended upon her to remain employed. Testimony from her secretaries/assistants was clear and convincing that the personal errands they performed far exceeded their picking up lunch for the judge. Two of the three secretary witnesses said they felt they had to perform the personal tasks in order to keep their jobs. Judge Alford's witness said both Ms. Harris and Ms. Brown worked on church bulletins for their own churches  even if they did, that does not justify the judge, their supervisor who had the power to discharge them, having them work on church materials not only for herself, but for her mother as well, all at taxpayer expense. The work performed for Mrs. Walker, Judge Alford's mother, was extensive and the use of public employees to perform work for a judge's parent cannot be excused.
Mr. Richard Roys (Judge Walker's secretary in 2004) and Deputy Marshal Bill Peck both testified they were glad to do certain personal favors for Judge Alford, because they liked her  it was voluntary. This misses the point that so far as errands performed during work time, whether the court employees wanted to perform personal duties or not is immaterial  to do so is misuse of public funds. Judge Bill Kelly opined in his testimony that colleagues may do favors for each other from time to time, as a courtesy, and we agree. For example, for a secretary to pick up lunch for the judge so that the judge can continue with work or for an employee to perform minor services so that the judge can continue on the bench or with judicial duties is not questioned as unethical. The degree to which Judge Alford used staff for personal services is the problem. In some cases the employees testified she did not reimburse them  the record reflects she reimbursed some staff on some occasions, but it was clear that she did not do so on every occasion.
Ms. Shirley Brown testified she was involved in an automobile accident driving her personal vehicle while working on Judge Alford's campaign for reelection  resulting in potential liability to the Shreveport City Court. Ms. Brown testified, and Judge Alford did not refute the testimony, that Judge Alford directed Ms. Brown not to tell anyone that she was involved in a personal errand for Judge Alford when the auto accident occurred, indicating Judge Alford knew Ms. Brown should not have been undertaking that duty.
Several witnesses testified that they worked on Judge Alford's campaign for judicial office and that they felt compelled to do so.[12] Ms. Shirley Brown testified as to collecting checks that were campaign contributions, which was fund raising that Judge Alford herself was not permitted to do (as the campaign committee was the only permissible campaign fund raiser). One of Judge Alford's witnesses claimed Ms. Shirley Brown did not seem to mind campaign work, and counsel for Judge Alford even questioned Ms. Brown about her willingness. In one respect, whether the employees wanted to assist is immaterial. The Shreveport City Court Employee Handbook expressly prohibited employees *832 from any public involvement in political activities. In his cross-examination, Judge Alford's counsel showed Ms. Brown a photograph of herself and others wearing campaign shirts and working on the campaign, which was clearly public political activity sanctioned by Judge Alford. Failure to observe the rules of court and a judge causing an employee to actually violate court policy violates Canons 1 and 2 A of the Code of Judicial Conduct.
We find that the above evidence is clear and convincing that Judge Alford violated Canons 1, 2 A, 2 B (a judge shall not lend the prestige of judicial office to advance the private interest of the judge or others), 3 B(1) and 3 B(2) (a judge shall require staff, court officials, and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties) of the Code of Judicial Conduct.
Charge 0272: Impermissible ex parte communication.
We agree with the Commission that Judge Alford's handling of the peace bond proceeding at the request of Mr. Michael Jones violated Canon 3 C of the Code of Judicial Conduct. Because of her prior relationship with Mr. Jones, Judge Alford should have recused herself from the required by Canon 3 C. Instead, she caused the matter to be specially set and agreed to preside, even though it was not the month assigned to her session of court for a peace bond case. While there was testimony that special settings occurred from time to time, and that she was empowered to specially set a case for a peace bond, the evidence presented reflected that she did not act neutrally, including that she agreed to hear a peace bond case when the plaintiff lived out of state  not merely outside of the city limits of the City of Shreveport.
Secondly, Judge Alford discussed the merits of the case with Mr. Jones on an ex parte basis, a violation of Canon 3 A(6). In Mr. Jones' affidavit he stated that he was seeking an expedited procedure to obtain something similar to a temporary restraining order. He also said that his brother, Hersy Jones, did not know about peace bonds. Mr. Jones admitted he discussed "the people involved" with Judge Alford. We find it unlikely for Judge Alford to have determined that a peace bond procedure was appropriate without Mr. Michael Jones having explained that the issue was the family's concerns about the nephew living in the home of Mrs. Hazel Jones and the factual basis for the issue. Notably, at the bond hearing Judge Alford told Mr. Jones she would call him if they needed to discuss the issue further. Next, as a matter of basic law, Judge Alford should not have allowed Mr. Jones to act on behalf of his mother in a court proceeding when she was actually present and opposing his stance without there being an order of interdiction of the mother. Notably, and perhaps most significantly, Judge Alford took the extraordinary measure of excluding Mr. Darnell from his grandmother's home without taking any medical testimony, based purely upon documents presented by Mr. Michael Jones that were not authenticated.
Further, Judge Alford's treatment of Mr. Darnell and Mrs. Hazel Jones demonstrates that she was not patient, dignified, or courteous, as is required by Canon 3 A(3) of the Code of Judicial Conduct.
Judge Alford maintained that one of the reasons she determined Mr. Darnell should be out of Mrs. Jones' house was his conduct as the hearing progressed. Notably, near the beginning of the proceeding, Judge Alford announced she was "not inclined *833 to have him continue to stay" with Mrs. Jones. Mr. Darnell's protestations had not occurred at this point in the proceeding. Further, Ms. Veronica Glover gave a sworn affidavit that Judge Alford pressured her to say that Mr. Darnell appeared dangerous at the hearing, which Ms. Glover said was untrue.[13]
The entire handling of the Jones v. Darnell case reflects that Judge Alford was ignoring established procedures of law and of her court, all to do a favor for a family friend. While there may have been merit to removing Mr. Darnell from Mrs. Jones' home, we will never know the truth because Judge Alford permitted a distortion of the legal procedures.
We find that the above evidence is clear and convincing that Judge Alford violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(3), 3 A(4) (a judge shall perform judicial duties without bias or prejudice), 3 A(6) (a judge shall not permit private or ex parte interviews, arguments, or communications designed to influence his or her judicial action in any case), 3 B(1), and 3 C (a judge should disqualify himself or herself in a proceeding in which the judge's recusation is required by law or applicable Supreme Court rule) of the Code of Judicial Conduct.
Judge Alford's misconduct was the subject of extensive media attention in the Shreveport area. The fact of this news coverage, including the press interviews Judge Alford granted, brought her judicial office into disrepute and reflected negatively on the administration of justice, which violated La. Const. art. V, § 25(C).
Having determined that Judge Alford violated Canons 1, 2 A, 2 B, 3 A(1), 3 A(2), 3 A(3), 3 A(4), 3 A(6), 3 A(7), 3 B(1), and 3 C of the Code of Judicial Conduct, we must determine the proper discipline.
In determining the proper sanction warranted in a judicial disciplinary proceeding, we turn to the factors set forth in In re: Chaisson, 549 So.2d 259 (La.1989):
To determine the appropriate sanction we consider the following nonexclusive "factors: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
Chaisson, 549 So.2d at 266. Here, Judge Alford's conduct extended over a period of years in which she took large quantities of prescribed drugs that created physical and psychological dependence, causing her ability to perform her duties to suffer. The evidence demonstrated repeated periods of stability and good work performance *834 followed by periods of impairment. Her misconduct affected her official judicial duties and in many cases occurred in the courtroom. Judge Alford, while recognizing on the last day of her hearing that her ingestion of large amounts of prescription drugs over an extended period could have adversely affected her job performance, has never admitted that her drug use caused an impairment that created violations of the Code of Judicial Conduct. She minimized her role in using public employees for personal purposes. She continued to insist that her actions with regard to the juvenile, G.S., were correct, despite being illegal, and she would not admit that her conduct in manipulating a peace bond proceeding was wrong. Judge Alford, for the most part, has attributed fault to others for the conduct for which she is criticized. Although Judge Alford's drug use has decreased, it is still significant, and she has not agreed to any treatment programs or monitoring mechanisms. She took office in 1997, and was not, therefore, new to the bench. There are no prior complaints of misconduct in the record. Judge Alford's problems with prescription drug use place the judiciary as a whole in a negative light and undoubtedly caused disrespect for the judicial system and the administration of justice in Shreveport. Her misuse of her staff and assigning the case of Jones v. Darnell to herself when she was clearly biased toward the plaintiff, indicate that she used her judicial office satisfy personal desires.
Judge Alford's misconduct included many instances of bad faith, including: (1). directing the Systems Manager for the City Court to delete two paragraphs from a memo that clarified that the court did not have definitive attendance records, and then sending the misleading memo to the Office of Special Counsel, (2) contacting court employees who had given sworn statements during the investigation seeking changes or clarifications, (3) trying to prevail on a deputy clerk to give a false affidavit regarding the peace bond matter, and (4) being less than forthcoming to her physicians and treatment facilities concerning her drug use and medical history.

CONCLUSION
Upon review of the record, we conclude that removal is warranted in this case. Judge Alford's misconduct in violating Canons 1, 2 A, 2 B, 3 A(1), 3 A(2), 3 A(3), 3 A(4), 3 A(6), 3 A(7), 3 B(1), and 3 C of the Code of Judicial Conduct, all resulting in bringing disrepute to the judicial office in violation of La. Const. art. V, § 25(C), coupled with her failure to accept responsibility and willful behavior is intolerable and mandates such serious discipline.

DECREE
For the foregoing reasons, we order that Judge Laleshia Walker Alford of the Shreveport City Court, Parish of Caddo, is hereby removed from office, and that her office is hereby declared vacant. Further, respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this Court as eligible to become a candidate for judicial office. Finally, pursuant to La. Sup.Ct. Rule XXIII, § 22, we cast respondent with costs incurred in the investigation and prosecution of this proceeding in the amount of $5,000.00.
REMOVAL FROM JUDICIAL OFFICE ORDERED
JOHNSON, J., concurs and assigns reasons.
JOHNSON, J., concurring:
After reviewing the record in this matter, I cannot agree with the majority's treatment of the evidence presented. The *835 Commission alleged that Judge Alford has "physical and psychological dependencies on prescription medications which seriously impair [her] judgment and mental faculties to such a degree that [she had], on several different occasions, been significantly impaired while performing judicial duties, including on the bench and in chambers." The evidence clearly demonstrates that Judge Alford has a complicated medical history, and that she suffers from a myriad of medical conditions. As a result, she admittedly has been prescribed, and takes, a substantial amount of prescription medication. However, the evidence submitted is not sufficient to prove that Judge Alford is addicted to, or abuses, these prescription medications.
Before this Court can impose discipline, the charge or charges against a judge must be proven by clear and convincing evidence. In re Jefferson, 753 So.2d at 184; In re Bowers, 721 So.2d at 880; In re Johnson, 683 So.2d at 1199; In re Huckaby, 656 So.2d at 296. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Jefferson, 753 So.2d at 184-85; In re Bowers, 721 So.2d at 880; In re Quirk, 705 So.2d at 176; In re Huckaby, 656 So.2d at 296.
In November of 2005, through referral from the Louisiana State Bar Association's Lawyers Assistance Program, Judge Alford was admitted to Pine Grove Recovery Center for an Addiction Medicine Evaluation with Dr. Chapman Sledge, Dr. Sledge found no clear diagnosis of a substance related disorder. He did find that Judge Alford has multiple medical, psychological, and vocational issues which complicate her presentation. Thus, he recommended that she complete a comprehensive evaluation in the Professional Enhancement Program.
In December of 2005, Judge Alford underwent a week-long evaluation at the Pine Grove Recovery Center. She underwent a physical examination, which confirmed that she suffers from chronic pain syndrome. She also underwent significant psychological testing. Notably, the testing indicated a low probability that Judge Alford has a substance dependence disorder. The evaluators were not able to establish a diagnosis of substance abuse or dependance. They also found no evidence that the quality of her work was impaired, and they stated that she was fit for duty. They did recommend that Judge Alford enter a residential eating disorder program, and that she might further benefit from intensive treatment in a program that would focus on her obsessive compulsive personality issues. They acknowledged that her eating disorder and history of compulsive spending make substance abuse a possibility.
Judge Alford was also admitted to the Psychiatric Unit at Willis-Knighton Medical Center for several days in April of 2006, where she was seen by Dr. Lionel Guillaume, who was to evaluate her to rule out opiate abuse and dependency. Following a chemical dependancy evaluation, Dr. Guillaume noted that she did not meet the criteria for chemical dependency or abuse. The report concluded that Judge Alford was not a candidate for any substance abuse treatment.
Following recommendation of the Judiciary Commission, Judge Alford was again seen at Pine Grove Recovery Center in October of 2006 for an Addiction medicine evaluation by Dr. Chapman Sledge. After a several hour evaluation, Dr. Sledge recommended a more complete evaluation prior to making further recommendations. Judge Alford was then admitted for a *836 month-long evaluation at Pine Grove. The addictionologist, Dr. Alexis Polles, found insufficient evidence to conclude that Judge Alford has a substance abuse problem. The evaluation report states that collateral source reports, including reports from individuals who knew her quite well, provided no first-hand evidence of a substance abuse problem, and her interviews with the addictionologist and other evaluation team members provided little substantiation for a diagnosis of substance abuse. They did find evidence of an eating disorder, and recommended treatment for that issue.
During this evaluation, Judge Alford was administered the Minnesota Multiphasic Personality Inventory  II (MMPI-II), the Posttraumatic Stress Diagnostic Scale (PDS), the Eating Disorders Inventory  II (EDI-II), the Substance Abuse Subtle Screening Inventory  III (SASSI-III) and the Beck Depression Inventory  II (BDI-II). Importantly, the results of the SASSI-III indicated a low probability that she has a substance dependence disorder. She also underwent an addictionology evaluation. Dr. Chapman Sledge reviewed all of the pharmacy records and performed an addictionology evaluation. He concluded that "[t]he sheer volume of medications she is taking is high, but in the context of her medical problems, it is not clear that she is out of control. Routine addiction treatment does not appear to be indicated."
Judge Alford also underwent a vocation evaluation, after which it was concluded that Judge Alford appeared to be in a highly stressful job situation, and that she did not appear to be taking very good care of her overall wellness. The report stated that it was also possible that she had legitimate pain that required medical treatment.
Judge Alford underwent a complete physical examination by Dr. Ellen Ovson. Dr. Ovson concluded that: "Medically, the patient does suffer with chronic pain syndrome and has had multiple medical problems. Certainly, the patient's medical problems could be managed quite effectively without the use of mood altering substances. Would recommend continuing the Yasmin, Cymbalta, Zyrtec, Singulair, Provigil, Seroquel and Topamax."
The report did state that although no diagnosis of substance abuse was made, the doctors were concerned about Judge Alford's vulnerability in this area. The report stated that Judge Alford has a history of eating disorder and a pattern of compulsive spending, both of which share similarities to chemical dependency. And, although they may be medically justifiable, Judge Alford is certainly on a large number of medications. The report stated that this should be an area of concern and deserves continued monitoring. It was recommended that Judge Alford undergo treatment for her eating disorder, and that while she is in treatment, and under medical care, she should be weaned off all of her addictive medications.
Despite the existence of these multiple reports from experts on substance abuse, all finding no evidence of drug dependency, Special Counsel called an expert in pharmacology to build its case against Judge Alford. Special Counsel relied on the testimony of Dr. Lonald Daughtry, an assistant professor at Xavier University, to prove Judge Alford's drug dependency.
To be generally admissible, evidence must be relevant and not unduly prejudicial. LSA-C.E. arts. 104 & 401-403. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, *837 training, or education, may testify thereto in the form of an opinion or otherwise." LSA-C.E. art. 702.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court replaced the "general acceptance" standard of expert testimony with a standard that charges the trial court to act as "gatekeeper" to "ensure that scientific testimony or evidence is not only relevant but reliable." Id. This Court adopted the Daubert analysis in State v. Foret, 628 So.2d 1116, 1121 (La.1993).
Daubert established the following nonexclusive factors to be considered to determine the admissibility of expert testimony:
(1) The "testability" of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469.
This Court in Foret characterized the Daubert factors as "observations" which provide a "helpful guide for our lower courts in considering this difficult issue." Foret, supra. The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." State v. Chauvin, XXXX-XXXX (La.5/20/03), 846 So.2d 697 Daubert requires that the reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Foret, supra, (quoting Daubert, 509 U.S. at 580, 113 S.Ct. 2786, 125 L.Ed.2d 469).
The Daubert/Foret guidelines are used as an aid in interpreting article 702 and ensure that scientific and technical expert testimony meets minimal standards of reliability and relevance. See State v. Foret, 628 So.2d at 1123. The Daubert/Foret guidelines require that expert opinions be grounded in approved methods and procedures of science, rather than subjective belief or unsupported speculation. The trial court must also ensure that the scientific "evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct at 2795; see LSA-C.E. 104 & 401-403. The court must also determine whether the "probative value" of the expert testimony or opinion would be "substantially outweighed by the danger of confusion or an undue prejudicial effect on the fact finder. LSA-C.E. art. 403; see Foret, 628 So.2d at 1127.
Here, the Commission relied solely on the testimony of Dr. Daughtry, an expert in Psychopharmacology, who reviewed Judge Alford's medical and pharmaceutical records. Dr. Daughtry determined that she was regularly consuming what he termed the "trinity cocktail." Dr. Daughtry described a "trinity cocktail" as a highly addictive combination of the prescription drugs Xanax[1] (Valium or Clonazepam), Soma[2] (Zanaflex or Flexeril), and Vicodin[3] *838 (Loratab). It is interesting to note that none of the physicians who testified was familiar with the "trinity cocktail," although Dr. Wall allowed that his wife had read something about it in the newspaper.
First, I would note that Dr. Daughtry is not a Physician, nor has he examined or treated Judge Alford. Thus, he is not qualified to give a medical opinion based on the review of Judge Alford's medical and pharmaceutical records. Dr. Daughtry was only qualified to give the general pharmacology effect of the drugs prescribed for Judge Alford. In my view the lines were blurred when Dr. Daughtry testified, at length, concerning Judge Alford's history of what he described as "doctor shopping," utilization of multiple pharmacies to fill prescriptions, and "her unusual in depth knowledge of drugs and drug entities," all of which he opined was characteristic of someone who was addicted to prescriptive drugs. It was clear legal error to allow Dr. Daughtry to give an opinion, based on Judge Alford's medical and prescription drug record, that she poses a substantial threat of serious harm to the public or the administration of justice. Dr. Daughtry stated:
A. . . . I believe that . . ., it would be virtually impossible for someone to consume this quantity of narcotic analgesic over a period of time and function in a cognitive level without being debilitated. Q. And do you believe someone who sits as a judge and consumed this amount of narcotics in these quantities, and particularly the ones that I'm emphasizing, the Trinity and the Duragesic patches and the Stadol, can function as a judge? [Emphasis added]
A. I wouldn't want to be in front of her, yeah. Yes, I don't believe that she could function adequately in that position.
Dr. Daughtry used the term "trinity cocktail" throughout his testimony to describe the prescribed medications used by Judge Alford for her various medical conditions. The record is devoid of evidence that Judge Alford mixed the prescribed medication to create this so called "trinity cocktail." This term "trinity cocktail" only serves to create a negative connotation of drug abuse and/or a common street junkie or addict, and it is unduly prejudicial. La. C.E. arts. 104 & 401-403.
For all of the above reasons, I find Dr. Daughtry's testimony to be unreliable on the issue of Judge Alford's addiction. Judge Alford apparently suffers from several chronic medical conditions, which are well documented. The prescribed medications are highly addictive. Yet, the overwhelming evidence fails to establish proof of addiction.
While I am cognizant that none of the addictionology experts concluded that Judge Alford was addicted to these medications, it is clear that, based on the testimony of numerous lay witnesses, Judge Alford's performance was affected by these medications on numerous occasions. Moreover, I find that the testimony clearly demonstrates that Judge Alford's ability to perform her job has been adversely impacted by the medications she is taking. While I am sympathetic to the fact that *839 Judge Alford suffers from numerous medical conditions for which these medications are necessary, I must agree with the majority that Judge Alford's conduct poses a substantial threat of serious harm to the public or the administration of justice. I find this case similar to In re Doggett, XXXX-XXXX (La.5/25/04), 874 So.2d 805, where this Court ordered Judge Doggett removed from office after finding that his alcohol abuse had negatively impacted his ability to perform his judicial duties. The Court relied on witness testimony that Judge Doggett had appeared visibly intoxicated on the bench and in chambers, exhibited slurring speech, was disoriented and unable to focus, shaky and walking unsteadily. I find that the evidence in this case shows a similar pattern of behavior by Judge Alford.
For the above reasons, I concur with the majority that Judge Alford should be removed from office.
NOTES
[1] Judge Alford returned to Pine Grove in late October 2006 and stayed for approximately 30 days, at which time she testified that she left because she "had run out of money." Her drug screen on admission was positive for benzodiazepines, including nordazepam, oxpam, and temazepam.
[2] La. Const, art. V, § 25(C) provides:

On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
[3] Mr. Jones told Judge Alford that he was acting pursuant to a power of attorney from his mother. However, Mrs. Jones was not interdicted, and she appeared in person before Judge Alford at the peace bond hearing.
[4] By way of example, during the hearing, Mrs. Hazel Jones protested several times that she did not want her nephew, Mr. Darnell, to leave her home. Judge Alford responded, "This is my decision. This is what I'm deciding." Judge Alford also told Mrs. Jones that "it would take one call" from her and that Mr. Darnell "would go to jail right now. One call." Furthermore, at the commencement of the proceeding, a stipulation was presented to Judge Alford, signed by Mr. Jones, Mrs. Jones, and Mr. Darnell, which represented their agreement that Mr. Darnell would continue to live with Mrs. Jones "so long as he controls himself." Despite this document, and the expressed wishes of Mrs. Jones, Judge Alford granted a peace bond against Mr. Darnell and directed him to have no contact with Mrs. Jones for six months.
[5] See La. Ch.Code art. 822(C), which provides that "[n]o child subject to the jurisdiction of the juvenile court shall be held in an adult jail or lockup."
[6] Formal Charge 0259 does not allege that Judge Alford violated Canon 7 B(1)(b).
[7] From April 2006 through April 2007, Judge Alford tempered her use of these five drugs. She no longer used Stadol or the Duragesic patch, and there was "some improvement" in her consumption of the drugs that constitute the Trinity Cocktail, according to Dr. Daughtry.
[8] Judge Alford's medical records reflect that at one point she had seen 28 different physicians from whom she obtained prescriptions for narcotic pain medication.
[9] Dr. Daughtry defined a word salad as "a string of certain words together that don't make sense and kind of like a free association," or "gibberish." For example, in August 2005, Judge Alford sentenced a defendant to do a report on why guns are so dangerous in America, then stated, "And the possession of dry or dealing in what friends firearms I'm sorry quite obsolete. So I'm not sure what that one is about position of dealing okay this is some kind of possession case which should have gone to the district so disregard the possession case it is at a district okay. You free to go." At the hearing on interim disqualification, Judge Alford could offer no explanation for this statement, but she denied that she was speaking in a "word salad."
[10] In one notable instance, Judge Alford sentenced a defendant for driving infractions by giving him 90 days to go to Citi Trends, a Shreveport clothing store, "and pick out what you want." When asked about this matter, Judge Alford agreed the sentence had nothing to do with the case before her, but she claimed it reflected nothing other than that she "made a mistake" arid is "human and infallible [sic]."
[11] See LWA Exh. 71, a photograph of Deputy Marshal Emberton gesturing toward Judge Alford's portrait with his middle finger raised. Deputy Marshal Emberton is also sticking out his tongue and appears to be laughing. He testified at the hearing that Deputy Marshal Judice took the photograph with his cell phone camera "the day we were told that Judge Alford was suspended." Deputy Marshal Emberton explained:

This photo was taken the day that we were informed that Judge Alford had been suspended. The marshal advised me and another deputy to go remove her picture from the courthouse wall. It was taken at that time. The reason I did that is because I was mad. I was tired of having to deal with defendants who . . . [were] charged with the same thing [who] had two different sentences, and we had to explain to them why. People didn't get a library card, so they had to  violated their probation and go to jail for 30 days, and we had to explain to them why. Everybody was upset in the courthouse at that time about the things that we had to go through. To be honest with you, I was glad she was gone at the time. In hindsight, it wasn't the best thing to do and I probably shouldn't have done it. But that's what happened the day that photo was taken.
[12] This court has previously held that it is wrong for a judge to require his or her court staff to use court time to work on the judge's campaign for reelection. See In re: King, 03-1412 (La. 10/21/03), 857 So.2d 432.
[13] According to Ms. Glover, she was asked by Judge Alford to put into writing that Mr. Darnell had a violent attitude at the peace bond proceeding, and that Mrs. Hazel Jones appeared to be confused. Ms. Glover refused to execute such an affidavit because she "didn't want to put anything in writing that wasn't true." When she did not provide Judge Alford with the requested affidavit, Judge Alford called her "additional times" about it, as did Judge Alford's secretary. Ms. Glover testified that she felt harassed by these contacts. Ultimately, Ms. Glover did execute an affidavit in December 2005, at the request of the court's administrator, Ms. Virginia Hester, in which she attested to these facts.
[1] Clonazepam is in a class of drugs called benzodiazepines. Clonazepam affects chemicals in your brain that may become unbalanced and cause seizures or symptoms of panic disorder. Clonazepam is used to treat seizures and panic disorder.
[2] Soma is used to treat discomfort associated with acute, painful conditions. It is usually used as a supplement to rest and physical therapy. Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain. Soma is used together with rest and physical therapy to treat injuries and other painful musculoskeletal conditions.
[3] Vicodin is used for: Treatment of moderate to moderately severe pain. Vicodin (Hydrocodone) is in a group of drugs called narcotic pain relievers. It is similar to codeine. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. The combination of acetaminophen and hydrocodone is used to relieve moderate to severe pain.